[Civ. No. 24479. Fourth Dist., Div. One. May 27, 1982.]

SOPHIA ELAM, Plaintiff and Appellant, v.
COLLEGE PARK HOSPITAL, Defendant and Respondent.

---

COUNSEL

Wesley H. Harris and George W. Hauer for Plaintiff and Appellant.

Rhoades & Hollywood and Daniel S. Belsky for Defendant and Respondent.

Musick, Peeler & Garrett, James E. Ludlam, Charles F. Forbes, Horvitz & Greines, Ellis J. Horvitz and Kent L. Richland as Amici Curiae on behalf of Defendant and Respondent.

---

OPINION

**WORK, J.**—The pivotal question presented by this appeal is whether a hospital is liable to a patient under the doctrine of corporate negligence for negligent conduct of independent physicians and surgeons who, as members of the hospital staff, avail themselves of the hospital facilities, but who are neither employees nor agents of the hospital. We answer this question in the affirmative and reverse the judgment.

### Factual and Procedural Background

After Sophia Elam filed a complaint alleging medical malpractice against doctors Martin J. Schur, Merrill F. Cahn and Samuel Markarian, and College Park Hospital (Hospital),[1] Hospital was granted summary judgment.

---

[1]The complaint alleged: "During said period of time the defendants COLLEGE PARK HOSPITAL and DOES I, II and XI through XX and each of them so negligently and carelessly cared for, treated and rendered medical services upon the person and body of the plaintiff and so negligently and carelessly operated, managed, controlled and con-

Elam complains Schur, a licensed podiatrist, performed negligent podiatric surgery at Hospital to correct bilateral bunions and bilateral hammer toes. She was admitted to Hospital for surgery by Schur and Markarian, a medical doctor, pursuant to a hospital coadmission procedure requiring concurrence of a medical doctor before admitting a podiatric patient and the physician's assumption of responsibility for the overall medical care of that patient, including the taking of a medical history and the performance of a physical examination to insure podiatric surgery is not contraindicated.[2] The surgery was performed by Schur and Cahn.

Schur was always an independent contractor with Hospital and never an employee or agent. He was never paid by Hospital, as he operated his own office and billed Elam directly. She had personally selected him for medical treatment. In June 1974 he applied for appointment to Hospital's medical staff. After verifying his doctor of podiatric medicine degree, state podiatric license, and podiatric surgery privileges at Hillside and Heartland Hospitals in San Diego, Hospital's governing board granted Schur podiatric surgery privileges on April 25, 1975.

Between April 25, 1975 and the date of surgery, Hospital's medical care evaluation committee (later renamed patient care evaluation committee), was responsible for evaluating and improving the quality of care rendered to patients treated at Hospital. The committee met monthly, reviewing the medical charts of doctors and podiatrists treating patients at Hospital. On this routine basis, Schur's medical charts were reviewed along with the charts of other doctors and podiatrists. The committee constituted a peer review mechanism designed to continually monitor, evaluate and improve the quality of medical care furnished patients at Hospital in compliance with the standards of the JCAH. The committee never complained or reported to the Hospital's administration it considered or had reason to consider Schur incompetent or unqualified to practice podiatric surgery.

ducted their services, activities and supervision in connection with plaintiff's care and treatment, and so negligently and carelessly failed to properly ensure the character, quality, ability and competence of individuals treating patients in said hospital that as a direct and proximate result thereof plaintiff was caused to and did suffer the injuries hereinafter alleged."

[2]This coadmission procedure is required by Hospital's bylaws and the joint committee on accreditation of hospitals (JCAH), because podiatrists are not medical doctors.

Elam's counsel has handled three other cases against Schur, including *Perez* v. *Schur*, No. 354963, filed June 17, 1974; *Earlywine* v. *Schur*, No. 359278, filed October 22, 1974; and *Bailey* v. *Schur*, No. 383533, filed June 17, 1976. Each case involved Schur's first seeing the patient less than a week before the operation. In its answers to interrogatories, Hospital *admits it learned of the Bailey malpractice suit against Schur approximately four and one-half months before Elam's surgery.*[3]

### The Doctrine of Corporate Hospital Liability

Elam asserts Hospital breached its duty to her of insuring the competence of its staff physicians.[4] In other words, she contends a hospital owes a duty to the patient of selecting and reviewing the competency of its staff physicians carefully. California case precedent establishes a hospital may be held liable for a doctor's malpractice when the physician is actually employed by the hospital or is ostensibly the agent of the hospital (see *Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 166-168 [41 Cal.Rptr. 577, 397 P.2d 161]; *Seneris* v. *Haas* (1955) 45 Cal.2d 811, 829-832 [291 P.2d 915, 53 A.L.R.2d 124]; *Rice* v. *California Lutheran Hospital* (1945) 27 Cal.2d 296, 304 [163 P.2d 860]), but not absent such a relationship (see *Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420, 435 [71 Cal.Rptr. 903, 445 P.2d 519]; *Mayers* v. *Litow* (1957) 154 Cal.App.2d 413, 417-418 [316 P.2d 351]; *Konnoff* v. *Fraser* (1944) 62 Cal.App.2d 788, 791 [145 P.2d 368]; compare, *Hedlund* v. *Sutter Med. Serv. Co.* (1942) 51 Cal.App.2d 327 [124 P.2d 878] (hospital may be held liable for tortious acts of physicians where it has contracted to furnish medical services)). However, we find no appellate decision of this state addressing precisely this application of the doctrine of corporate hospital liability (Comment, *Piercing The Doctrine of Corporate Hospital Liability, supra,* 17 San Diego L.Rev. 383, 386, fn. 16), nor "consider[ing] tort liability of a hospital for negligent

---

[3]In the Bailey case, plaintiff's initial complaint was of a callus on her left foot. Expert testimony confirmed, at an arbitration hearing in the presence of Hospital's counsel, Schur performed extensive surgery on both feet in Hospital and billed for operative procedures which were never done.

[4]"Staff physicians" are those doctors who have been accorded "staff privileges" at a hospital for a period ordinarily of not more than two years. A physician must be a member of the hospital's medical staff in order to admit patients to the hospital. (Comment,. *Piercing The Doctrine of Corporate Hospital Liability* (1980) 17 San Diego L.Rev. 383,386, fn. 2; Comment, *The Hospital's Responsibility for its Medical Staff: Prospects for Corporate Negligence in California* (1977) 8 Pacific L.J. 141, fn. 3.)

selection or retention of staff practitioners" (*Matchett* v. *Superior Court* (1974) 40 Cal.App.3d 623, 629, fn. 4 [115 Cal.Rptr. 317]; Comment, *The Hospital's Responsibility for its Medical Staff: Prospects for Corporate Negligence in California, supra*, 8 Pacific L.J. 141, 142.)[5] Thus, we treat this matter as one of first impression.[6]

■ The essential elements of actionable negligence include: (1) a defendant's legal duty to use due care; (2) a breach of that duty; and (3) the breach as the proximate or legal cause of the resulting injury. (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 594 [83 Cal.Rptr. 418, 463 P.2d 770]; *George A. Hormel & Co.* v. *Maez* (1979) 92 Cal.App.3d 963, 966 [155 Cal.Rptr. 337]; *Valdez* v. *J. D. Diffenbaugh Co.* (1975) 51 Cal.App.3d 494, 504 [124 Cal.Rptr. 467].) Hospital argues it does not owe its patients a legal duty to exercise reasonable care in selecting, reviewing and periodically evaluating the competency of the physicians and podiatrists it permits to treat patients within its facilities. Therefore, even if its unreasonable actions were a proximate cause of Elam's injuries, it may not be held liable on a negligence theory. Accordingly, in order to determine whether the doctrine of corporate hospital liability should be applied, we must determine whether the cited legal duty of care exists—"an essential precondition to liability founded on negligence." (*Hooks* v. *Southern Cal. Permanente Medical Group* (1980) 107 Cal.App.3d 435, 443 [165 Cal.Rptr. 741].)[7]

[5]The term "corporate negligence" has been commonly used to describe hospital liability predicated not upon vicarious liability (but see 36 Cal.Jur.3d, Healing Arts and Institutions, § 139, p. 322, and 15 Cal.Jur.3d, Corporations, § 179, p. 226), but upon its violation of a duty—as a corporation—owed directly to the patient which resulted in injury. (Southwick, *The Hospital as an Institution—Expanding Responsibilities Change Its Relationship with the Staff Physician* (1973) 9 Cal. Western L.Rev. 429, 440.)

[6]It can, however, be argued that the doctrine of corporate negligence has been implicitly accepted and applied in this state by the holding of a hospital to a duty of ordinary care in furnishing suitable supplies, equipment and facilities commensurate with the demands of a particular case. (See *Bost* v. *Riley* (1980) 44 N.C.App. 638 [262 S.E.2d 391, 396]; 36 Cal.Jur.3d, Healing Arts and Institutions, § 142, pp. 326-327.)

[7]Although it constitutes "[a] necessary element of any cause of action for negligence" (*Rainer* v. *Grossman* (1973) 31 Cal.App.3d 539, 542 [107 Cal.Rptr. 469]; *Hooks* v. *Southern Cal. Permanente Medical Group, supra*, 107 Cal.App.3d 435, 443), "[a]nalysis of liability for negligence in terms of common law 'duty' has been criticized as a question-begging process. 'The assertion that liability must . . . be denied because defendant bears no "duty" to plaintiff "begs the essential question—whether plaintiff's interests are entitled to legal protection against the defendant's conduct. . . . It [duty] is a shorthand statement of a conclusion, rather than an aid to analysis in itself . . . .'"" (*Derrick* v. *Ontario Community Hospital* (1975) 47 Cal.App.3d 145, 152 [120

■ The threshold determination of whether a duty is owed the plaintiff constitutes primarily a question of law within the exclusive province of the court. (*Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]; *Kane v. Hartford Accident & Indemnity Co.* (1979) 98 Cal.App.3d 350, 355 [159 Cal.Rptr. 446].) "Duty, however, is a rather ephemeral concept: It may be imposed by statute or the terms of a contract; it may arise from the character of particular activities or from the nature of human society itself—and its ascertainment and definition in any specific factual context is an imprecise task at best." (*Valdez v. J. D. Diffenbaugh Co., supra,* 51 Cal. App.3d 494, 505.) Consequently, its existence or absence "cannot be determined by mechanical or formal tests. Rather, 'judicial recognition of such duty . . . is initially to be dictated or precluded by considerations of public policy.'" (*Smith v. Alameda County Social Services Agency* (1979) 90 Cal.App.3d 929, 935 [153 Cal.Rptr. 712], quoting *Peter W. v. San Francisco Unified Sch. Dist.* (1976) 60 Cal.App.3d 814, 822 [131 Cal.Rptr. 854].) In other words, "'"duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.'" (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734 [69 Cal. Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], quoting Prosser, Law of Torts (3d ed. 1964) at p. 333; *Weirum v. RKO General, Inc., supra,* 15 Cal.3d 40, 46; *Smith v. Alameda County Social Services Agency, supra,* 90 Cal.App.3d 929, 935.)

Our analysis of whether Hospital owed the disputed duty to Elam commences with the fundamental policy embodied in Civil Code section 1714, providing liability for injuries to another caused by one's failure to exercise ordinary care under the circumstances. (See *Hooks v. Southern Cal. Permanente Medical Group, supra,* 107 Cal.App.3d 435, 443; *George A. Hormel & Co. v. Maez, supra,* 92 Cal.App.3d 963, 967.) ■ "Duty" is thus presumed, as "no . . . exception should be made unless clearly supported by public policy." (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R. 3d 496].) Such "[a] departure from this fundamental principle involves

---

Cal.Rptr. 566]; *Commercial Standard Ins. Co. v. Bank of America* (1976) 57 Cal. App.3d 241, 248 [129 Cal.Rptr. 91].)

In light of the case precedent cited during the following discussion, we employ the, perhaps archaic, term of "duty" as a matter of convenience without addressing the current viability of the concept; for, our review of the relevant considerations in our analysis would be necessary regardless whether we employed them to establish responsibility or to preclude potential liability.

the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Id.*, at pp. 112-113.) However, the primary consideration is the foreseeability of the risk.[8] (*Weirum v. RKO General, Inc., supra*, 15 Cal.3d 40, 46; *Dillon v. Legg, supra*, 68 Cal.2d 728, 739.)[9]

■ Although not involving the determination of whether a hospital can be directly liable for the negligence of its staff physicians, case precedent establishes a hospital has a duty of reasonable care to protect patients from harm (*Rice v. California Lutheran Hospital, supra*, 27 Cal.2d 296, 299), including the discovery and treatment of their medical conditions. (See *Guilliams v. Hollywood Hospital* (1941) 18 Cal.2d 97 [114 P.2d 1]; and Comment, *The Hospital's Responsibility for its Medical Staff: Prospects for Corporate Negligence in California, supra* 8 Pacific L.J. 141, 149.) In *Rice v. California Lutheran Hospital, supra*, 27 Cal.2d 296, the Supreme Court held a """hospital owes its patients the duty of protection, and must exercise such reasonable care toward a patient as his known condition may require."""" (*Id.*, at p. 299; *Murillo v. Good Samaritan Hospital* (1979) 99 Cal.App.3d 50, 55 [160 Cal.Rptr. 33]; *Valentin v. La Societe Francaise* (1946) 76 Cal. App.2d 1, 6 [172 P.2d 359].) Moreover, the court held a hospital is "under a duty to observe and know the condition of a patient. Its business is caring for ill persons, and its conduct must be in accordance with that of a person of ordinary prudence under the circumstances, a vital part of those circumstances being the illness of the patient and incidents thereof." (*Rice v. California Lutheran Hospital, supra*, 27 Cal.2d 296, 302; *Murillo v. Good Samaritan Hospital, supra*, 99 Cal.App.3d 50,

---

[8]"While duty is a question of law, foreseeability is a question of fact for the jury." (*Weirum v. RKO General, Inc., supra*, 15 Cal.3d 40, 46.)

[9]The Supreme Court apparently viewed this matter without relying upon the cited presumption in *Weirum v. RKO General, Inc., supra*, 15 Cal.3d 40, 46, stating: "Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall."

55.) We can perceive of no reason why this established duty of
due care does not encompass the duty asserted by Elam; for, as a gener-
al principle, a hospital's failure to insure the competence of its medical
staff through careful selection and review creates an unreasonable risk
of harm to its patients.

Our conclusion accords with statutory authority recognizing hospital
accountability for the quality of medical care provided and the compe-
tency of its medical staff. Health and Safety Code section 1250, subdi-
visions (a), (b), (f) and (g)[10] define hospital in pertinent part as "a
health facility having a duly constituted governing body with overall ad-
ministrative and professional responsibility . . . ." More specifically,
section 32125 confers upon the board of directors of a public hospital
the responsibility of its operation in accordance with "the best interests
of the public health," including the power to "make and enforce all rules,
regulations and by-laws necessary for the administration, government,
protection and maintenance" of the hospital, and to insure that minimum
standards of operation required by statute are followed. Sections 32128[11]

---

[10]All statutory references are to the Health and Safety Code unless otherwise
specified.

[11]Section 32128 provides: "The rules of the hospital, established by the board of di-
rectors pursuant to this article, shall include: 1. Provision for the organization of
physicians and surgeons, podiatrists, and dentists licensed to practice in this state who
are permitted to practice in the hospital into a formal medical staff, with appropriate
officers and bylaws and with staff appointments on an annual or biennial basis; 2. Pro-
vision for procedure for appointment and reappointment of medical staff as provided by
the standards of the Joint Committee on Accreditation of Hospitals; 3. Provisions that
the medical staff shall be self-governing with respect to the professional work per-
formed in the hospital; that the medical staff shall meet in accordance with the
minimum requirements of the Joint Committee on Accreditation of Hospitals; and that
the medical records of the patients shall be the basis for such review and analysis; 4.
Provision that accurate and complete medical records be prepared and maintained for
all patients (medical records to include identification data, personal and family history,
history of present illness, physical examination, special examinations, professional or
working diagnoses, treatment, gross and microscopic pathological findings, progress
notes, final diagnosis, condition on discharge, and such other matters as the medical
staff shall determine); and, 5. Such limitations with respect to the practice of medicine
and surgery in the hospital as the board of directors may find to be in the best interests
of the public health and welfare, including appropriate provision for proof of ability to
respond in damages by applicants for staff membership; provided, that no duly licensed
physician and surgeon shall be excluded from staff membership solely because he or

and Business and Professions Code section 2282[12] set forth, at least by implication, the scope of public and private hospitals' duty of care. Regarding staff selection, although the medical staff is to be "self-governing," a hospital must provide procedures for selection and reappointment of the medical staff in accordance with JCAH standards, implying investigation of competency for initial appointment and periodic review of competency before reappointment. The hospital's duty to guard against physicians' incompetency is further implied by requiring renewal of staff privileges at least every two years (implying a periodic competency review) and the periodic review of the medical records of hospital patients. Although these reviews are conducted by medical staff "peer" committees, the governing body of the hospital is responsible for establishing the review procedures. Finally, section 32128 provides that the hospital rules shall include "[s]uch limitations with respect to the practice of medicine and surgery in the hospital as the board of directors may find to be in the best interests of the public health and welfare . . . ." (See Comment, *The Hospital's Responsibility for its Medical Staff: Prospects for Corporate Negligence in California, supra*, 8 Pacific L.J. 141, 150-159.)

---

she is licensed by the Board of Osteopathic Examiners.

"Said rules of the hospital shall, insofar as consistent herewith, be in accord with and contain, minimum standards not less than the rules and standards of private or voluntary hospitals operating within the district."

[12]Business and Professions Code section 2282 provides: "The regular practice of medicine in a licensed general or specialized hospital having five or more physicians and surgeons on the medical staff, which does not have rules established by the board of directors thereof to govern the operation of the hospital, which rules include, among other provisions, all the following, constitutes unprofessional conduct:

"(a) Provision for the organization of physicians and surgeons licensed to practice in this state who are permitted to practice in the hospital into a formal medical staff with appropriate officers and bylaws and with staff appointments on an annual or biennial basis.

"(b) Provision that membership on the medical staff shall be restricted to physicians and surgeons and other licensed practitioners competent in their respective fields and worthy in professional ethics. In this respect the division of profits from professional fees in any manner shall be prohibited and any such division shall be cause for exclusion from the staff.

"(c) Provision that the medical staff shall be self-governing with respect to the professional work performed in the hospital; that the medical staff shall meet periodically and review and analyze at regular intervals their clinical experience; and the medical records of patients shall be the basis for such review and analysis.

"(d) Provision that adequate and accurate medical records be prepared and maintained for all patients."

Sections 70701[13] and 70703[14] of title 22, California Administrative Code, are even more explicit. Title 22, California Administrative Code,

---

[13]Title 22, section 70701, of the California Administrative Code provides: "(a) The governing body shall:

"(1) Adopt written bylaws in accordance with legal requirements and its community responsibility which shall include but not be limited to provision for:

"(A) Identification of the purposes of the hospital and the means of fulfilling them.

"(B) Appointment and reappointment of members of the medical staff.

"(C) Appointment and reappointment of one or more dentists and/or podiatrists to the medical staff when dental and/or podiatric services are provided.

"(D) Formal organization of the medical staff with appropriate officers and bylaws.

"(E) Membership on the medical staff which shall be restricted to physicians, dentists and podiatrists competent in their respective fields, worthy in character and in professional ethics. . . .

"(F) Self-government by the medical staff with respect to the professional work performed in the hospital, periodic meetings of the medical staff to review and analyze at regular intervals their clinical experience and requirement that the medical records of the patients shall be the basis for such review and analysis.

"(G) Preparation and maintenance of adequate and accurate medical records for all patients.

" . . . . . . . . . . . . . .

"(3) Provide appropriate physical resources and personnel required to meet the needs of the patients and shall participate in planning to meet the health needs of the community.

" . . . . . . . . . . . . . .

"(6) Require that the medical staff establish controls that are designed to ensure the achievement and maintenance of high standards of professional ethical practices including provision that periodically all physicians may be required to demonstrate their ability to perform surgical and other procedures competently and to the satisfaction of an appropriate committee or committees of the staff.

"(7) Assure that medical staff bylaws, rules and regulations are subject to governing body approval, which approval shall not be withheld unreasonably. These bylaws shall include an effective formal means for the medical staff, as a liaison, to participate in the development of all hospital policy."

[14]Title 22, section 70703, of the California Administrative Code provides in pertinent part: "(a) Each hospital shall have an organized medical staff responsible to the governing body for the fitness, adequacy and quality of the medical care rendered to patients in the hospital.

"(b) The medical staff shall be composed of physicians and, where dental or podiatric services are provided, dentists or podiatrist.

"(c) The medical staff, by vote of the members and with the approval of the governing body, shall adopt written bylaws which provide formal procedures for the evaluation of staff applications and credentials, appointments, reappointments, assignment of clinical privileges, appeals mechanisms and such other subjects or conditions which the medical staff and governing body deem appropriate.

" . . . . . . . . . . . . . .

"(e) The medical staff shall provide in its bylaws, rules and regulations for the functions to be performed by the following committees: executive credentials, medical records, tissue, utilization review, infections and pharmacy and therapeutics. In those hospitals where appropriate, these functions may be performed by a committee of the whole or its equivalent. These committees shall make reports of their activities and rec-

section 70701, subdivision (6) mandates the hospital governing body "[r]equire that the medical staff establish controls that are designed to ensure the achievement and maintenance of high standards of professional ethical practices including provision that periodically all physicians may be required to demonstrate their ability to perform surgical and other procedures competently and to the satisfaction of an appropriate committee or committees of the staff." Moreover, title 22, California Administrative Code, section 70703, subdivision (a) requires each hospital to "have an organized medical staff responsible to the governing body for the fitness, adequacy and quality of the medical care rendered to patients in the hospital."

Further, our conclusion is consonant with the public's perception of the modern hospital as a multifaceted, health-care facility responsible for the quality of medical care and treatment rendered. The community hospital has evolved into a corporate institution, assuming "the role of a comprehensive health center ultimately responsible for arranging and coordinating total health care." (Southwick, *The Hospital as an Institution—Expanding Responsibilities Change Its Relationship with the Staff Physician* (1973) 9 Cal. Western L.Rev. 429.) The patient treated in such a facility receives care from a number of individuals of varying capacities and not merely treated by a physician acting in isolation. (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 491 [154 P.2d 687, 162 A.L.R. 1258].) The patient relies upon the effectiveness of this "highly integrated system of activities . . . ." (*Id.*, at p. 493; see Comment, *The Hospital's Responsibility for its Medical Staff: Prospects for Corporate Negligence in California, supra,* 8 Pacific L.J. 141, 149-150.) Consequently, "[t]he concept that a hospital does not undertake to treat patients, does not undertake to act through its doctors and nurses, but only procures them to act solely upon their own responsibility, no longer reflects the fact. The complex manner of operation of the modern-day medical institution clearly demonstrates that they furnish far more than mere facilities for treatment. They appoint physicians and surgeons to their medical staffs, as well as regularly employing on a

---

ommendations to the executive committee and the governing body as frequently as necessary and at least quarterly.

" . . . . . . . . . . . . . . .

"(g) The medical staff shall provide for availability of a staff physician for emergencies among the in-hospital population in the event that the attending physician or his alternate is not available.

" . . . . . . . . . . . . . . .

"(j) The medical staff shall develop criteria under which consultation will be required. These criteria shall not preclude the requirement for consultations on any patient when the director of the service, chairman of a department or the chief of staff determines a patient will benefit from such consultation."

salary basis resident physicians and surgeons, nurses, administrative and manual workers and they charge patients for medical diagnosis, care, treatment and therapy, receiving payment for such services through privately financed medical insurance policies and government financed programs known as Medicare and Medicaid. Certainly, the person who avails himself of our modern 'hospital facilities' (frequently a medical teaching institution) expects that the hospital staff will do all it reasonably can to cure him and does not anticipate that its nurses, doctors and other employees will be acting solely on their own responsibility." (*Johnson* v. *Misericordia Community Hospital* (1981) 99 Wis.2d 708 [301 N.W.2d 156, 164]; see *Bing* v. *Thunig* (1957) 2 N.Y.2d 656, 666-667 [163 N.Y.S.2d 3, 143 N.E.2d 3, 8].)

Moreover, imposing the duty of care upon a hospital should have the "prophylactic" effect of supplying the hospital with a greater incentive to assure the competence of its medical staff and the quality of medical care rendered within its walls. Otherwise stated, "[s]ince the corporate negligence theory focuses upon the hospital's own conduct in providing medical care, the spectre of liability based upon this theory should encourage the hospital to examine its conduct more carefully in order to prevent the occurrence of unreasonable harm to patients." (Comment, *The Hospital's Responsibility for its Medical Staff: Prospects for Corporate Negligence in California, supra*, 8 Pacific L.J. 141, 149; but see, *Piercing The Doctrine of Corporate Hospital Liability, supra*, 17 San Diego L.Rev. 383, 398-399; see generally, Southwick, *The Hospital as an Institution—Expanding Responsibilities Change Its Relationship with the Staff Physician, supra*, 9 Cal. Western L.Rev. 429, 466, regarding the mutual dependency of a hospital governing board and its medical staff.) Indeed, the hospital is in the best position to evaluate the competence of physicians it, in its discretion, allows to perform surgery and to practice within its premises, as it constitutes the only institutional "vehicle available to coordinate the delivery of health care of reasonable quality to large numbers of people, especially in urban areas." (*Id.*, at p. 466; see Vogel & Delgado, *To Tell The Truth: Physicians' Duty To Disclose Medical Mistakes* (1980) 28 UCLA L.Rev. 52, 74.)

Finally, our holding agrees with the decisions of courts in varying jurisdictions. It appears the proposition a hospital may be held liable to a patient under the doctrine of corporate negligence has its genesis in *Darling* v. *Charleston Community Memorial Hospital* (1965) 33 Ill.2d 326 [211 N.E.2d 253, 14 A.L.R.3d 860], where the court found hospital negligence in failing to require consultation with or examination by

members of its medical staff and to review the treatment rendered plaintiff. From this beginning, the doctrine has been utilized and expanded by the courts of several jurisdictions to collectively impose upon a hospital a direct and independent responsibility to its patients of insuring the competency of its medical staff and the quality of medical care provided through the prudent selection, review and continuing evaluation of the physicians granted staff privileges. (See, e.g., *Tucson Medical Center, Incorporated v. Misevch* (1976) 113 Ariz. 34 [545 P.2d 958, 960]; *Purcell v. Zimbelman* (1972) 18 Ariz.App. 75 [500 P.2d 335, 340-341]; *Kitto v. Gilbert* (1977) 39 Colo.App. 374 [570 P.2d 544, 550]; *Mitchell County Hospital Authority v. Joiner* (1972) 229 Ga. 140 [189 S.E.2d 412, 414]; *Johnson v. St. Bernard Hospital* (1979) 79 Ill.App.3d 709 [35 Ill.Dec. 364, 399 N.E.2d 198, 204-205]; *Mauer v. Highland Park Hospital Foundation* (1967) 90 Ill.App.2d 409 [232 N.E.2d 776, 779]; *Ferguson v. Gonyaw* (1975) 64 Mich.App. 685 [236 N.W.2d 543, 550]; *Gridley v. Johnson* (Mo. 1972) 476 S.W.2d 475, 484; *Foley v. Bishop Clarkson Memorial Hospital* (1970) 185 Neb. 89 [173 N.W.2d 881, 884-885]; *Corleto v. Shore Memorial Hospital* (1975) 138 N.J.Super. 302 [350 A.2d 534, 537-538]; *Felice v. St. Agnes Hospital* (1978) 65 App.Div.2d 388 [411 N.Y.S.2d 901, 907]; *Bost v. Riley, supra*, 262 S.E.2d 391, 396; *Pederson v. Dumouchel* (1967) 72 Wn.2d 73 [431 P.2d 973, 978, 31 A.L.R.3d 1100]; *Utter v. United Hospital Ctr., Inc.* (W.Va. 1977) 236 S.E.2d 213, 214-216; *Johnson v. Misericordia Community Hospital, supra*, 301 N.W.2d 156, 164-168; Annot. (196) 14 A.L.R.3d 873; see generally, *Hull v. North Valley Hospital* (1972) 159 Mont. 375 [498 P.2d 136]; *Moore v. Board of Trustees of Carson-Tahoe Hosp.* (1972) 88 Nev. 207 [495 P.2d 605]; *Fiorentino v. Wenger* (1967) 19 N.Y.2d 407 [280 N.Y.S.2d 373, 227 N.Ed.2d 296]; Annot. (1973) 51 A.L.R.3d 981; see contra *Schenck v. Government of Guam* (9th Cir. 1979) 609 F.2d 387, 390-391; *Stogsdill v. Manor Convalescent Home, Inc.* (1976) 35 Ill.App.3d 634 [343 N.E.2d 589, 612, 83 A.L.R.3d 838]; *Lundahl v. Rockford Memorial Hospital Association* (1968) 93 Ill.App.2d 461 [235 N.E.2d 671, 674]; Comment, *Piercing The Doctrine of Corporate Hospital Liability, supra*, 17 San Diego L.Rev. 383.)

In summary, we hold a hospital is accountable for negligently screening the competency of its medical staff to insure the adequacy of medical care rendered to patients at its facility. Contrary to the assertions of amicus, the California Hospital Association, the articulated public policy considerations support the imposition of this general duty and outweigh the potential effect of corporate hospital liability upon the

structure of medical malpractice insurance in California. Moreover, imposing hospital-corporate liability does not interfere with the Legislature's comprehensive efforts to ameliorate the integrity and quality of the health care system (see, e.g., Stats. 1975, 2d Ex. Sess., ch. 2, pp. 3978-4007), but rather supplements the efforts by encouraging hospitals to actively oversee the competence of their medical staff and the quality of the medical treatment rendered on their premises, while providing victims with an additional avenue for relief. Simply stated, the Legislature has not attempted to immunize the hospital from liability arising from its negligence. Instead, the underlying statutory intent of the cited legislative campaign is the protection and furtherance of the health care interest of the patient.

*The Trial Court Erred in Granting the Motion for Summary Judgment*

■ The law governing summary judgment procedure pursuant to Code of Civil Procedure section 437c is firmly established. "'The matter to be determined by the trial court in considering such a motion is whether the defendant (or the plaintiff) has presented any facts which give rise to a triable issue. The court may not pass upon the issue itself. Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor [fn. omitted] and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue. The aim of the procedure is to discover, through the media of affidavits, whether the parties possess evidence requiring the weighing procedures of a trial. In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts.'" (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851-852 [94 Cal.Rptr. 785, 484 P.2d 953], quoting *Stationers Corp.* v. *Dunn & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].)

■ In light of our conclusion Hospital owes generally a duty to insure the competency of its medical staff and to evaluate the quality of medical treatment rendered on its premises, the filed papers pertaining to the motion for summary judgment are replete with triable issues of

fact. For example, whether Hospital should have conducted an investigation through its peer review committee upon notice of the *Bailey* case? Whether the committee had conducted its periodic reviews of Schur in a nonnegligent manner? Assuming a review was made after notice of the *Bailey* case, was it performed in a nonnegligent manner? If it had been made in a careful and proper manner, would the committee have recommended revocation or suspension of Schur's staff privileges?

*Disposition*:

Judgment reversed.

Staniforth, Acting P. J., and Cazares, J.,* concurred.

On June 25, 1982, the opinion was modified to read as printed above.

---

*Assigned by the Chairperson of the Judicial Council.